H. D. RIDDLEBERGER, JR., ET AL.

V.

CHESAPEAKE WESTERN RAILWAY

Record No. 820760

Decided March 8, 1985, at Richmond

Present: All the Justices.

*James V. Lane (Donald D. Litten; Litten, Sipe & Miller*, on brief), for appellant.
*Phillip C. Stone (Ronald D. Hodges; Wharton, Aldhizer & Weaver*, on brief), for appellee.

THOMAS, J., delivered the opinion of the court.

In this appeal, we are called upon to decide whether Code § 55-154, Acts 1981, c. 518, violates the Constitution of Virginia. That code section and its related provision, Code § 55-155, concern a procedure by which an owner of realty can extinguish mineral rights reservations that encumber the realty.

The Riddlebergers sued to extinguish mineral rights reservations on their land. Chesapeake Western Railway (Chesapeake) filed a demurrer wherein Chesapeake contended that Code § 55-154 violates article IV, section 14(3), of the Constitution of Virginia in that it is a "local, special, or private law" changing the rules of evidence in a judicial proceeding. The trial court sustained the demurrer. We think the demurrer was properly sustained.

Because the demurrer was sustained, the well-pled facts and reasonable inferences arising therefrom must be taken as true. Those facts are as follows: By deed dated March 26, 1930, Chesapeake conveyed a tract of land to one C. C. Clinedinst and reserved "to itself, its successors and assigns all title and right to all minerals on or under the lands" therein conveyed. Subsequently, by deed dated May 27, 1970, H. D. Riddleberger, Jr., purchased 114.61 acres of the property from a successor in title to Clinedinst. Thereafter, by deed dated April 6, 1976, H. D. Riddleberger and his former wife, Patricia, acquired another portion of the Clinedinst property. Patricia Riddleberger died in 1977, leaving H. D. Riddleberger the sole owner of the property. At the time of suit, Riddleberger owned approximately 143.41 acres of the Clinedinst property subject to the dower interest of his present wife, Barbara.

We must also accept as true the allegations that all of the requirements of Code § 55-154 have been met by the Riddlebergers.

Since 1930, a period of more than 35 years from the time of the reservation, there has been no exercise of the reserved rights or if such reservation of mineral rights has been exercised, the minerals on the property have been exhausted and the rights abandoned for more than 35 years. Moreover, all taxes have been charged to and paid by the persons holding title to the property. Finally, no deed of bargain and sale of the mineral rights has been recorded.

If the statute is constitutional, then the demurrer should have been overruled and the Riddlebergers given the opportunity to prove their allegations. Every action of the legislature is presumed to be constitutional. *Peery* v. *Board of Funeral Directors*, 203 Va. 161, 123 S.E.2d 94 (1961); *Dean* v. *Paolicelli*, 194 Va. 219, 72 S.E.2d 506 (1952); *Ex Parte Settle*, 114 Va. 715, 77 S.E. 496 (1913). In light of this presumption, the burden is upon the person who assails the enactment to prove that it is unconstitutional. *Peery*, 203 Va. at 165, 123 S.E.2d at 97. Only where an act is plainly repugnant to some constitutional provision will it be declared unconstitutional. It is with these principles in mind that we must proceed to review the statute.

Code § 55-154, the statute here under attack, reads in pertinent part as follows:

In any case when a claim to minerals, coals, oils, ores or subsurface substances, in, on or under lands in the Commonwealth, except lands lying west of the Blue Ridge Mountains other than in the counties of Amherst, Augusta, Bland, Giles, Rockingham, Nelson, Botetourt, Roanoke, Craig or counties having a population of more than sixteen thousand five hundred but less than sixteen thousand nine hundred, of more than thirty-two thousand but less than thirty-two thousand nine hundred forty, of more than thirty thousand but less than thirty-one thousand, of more than fifteen thousand seven hundred but less than sixteen thousand, of more than sixty thousand but less than seventy thousand, of more than five thousand but less than five thousand three hundred fifty, and of more than twenty-six thousand six hundred and seventy but less than twenty-six thousand eight hundred, of more than twenty-six thousand three hundred but less than twenty-seven thousand five hundred twenty-five, of more than six thousand two hundred but less than six thousand seven hundred fifty, of seventeen thousand five hundred but less

than eighteen thousand two hundred, of fifty-six thousand but less than fifty-seven thousand five hundred, of fifty-three thousand but less than fifty-four thousand five hundred, or in any county having population of more than twenty-one thousand nine hundred fifty but less than twenty-two thousand, . . . of more than twenty-one thousand three hundred and less than twenty-one thousand nine hundred or in any county having a population of more than forty-three thousand but less than fifty thousand, or the right to enter such land for the purpose of exploring, mining, boring and sinking shafts for such minerals, coals, oils, ores or subsurface substances is derived or reserved by any writing made thirty-five years or more prior to the institution of the suit hereinafter mentioned, and

(a) Such right to explore or mine has not for a like period been exercised and for a like period the person having such claim or right has never been charged with taxes thereon but all the taxes on the land have been charged to and paid by the person holding the land subject thereto, and for a like period no deed of bargain and sale of such claim or reservation in such mineral rights in the lands embraced in such claim has been recorded in the clerk's office of the county wherein the lands are located; or

(b) When the right to explore and mine has been exercised and the minerals, coals, oils, ores and subsurface substances in or on the land have been exhausted and the right of mining or boring has been abandoned for a like period, *then it shall be prima facie presumed that no minerals, coals, oils, ores or subsurface substances exist in, on or under such land.*

(Emphasis added.) Chesapeake contends that the several exceptions which apply west of the Blue Ridge amount to prohibited special, local, or private legislation.

▪ The principles relating to the question whether an enactment violates the special law prohibition in the Constitution have evolved over time. Some of the basic principles were developed in *Settle.* That case concerned a challenge to an act which provided that in counties having a population of more than 300 persons per square mile, the judge of the circuit court had discretion to appoint a trial justice. We held that statute constitutional. We ex-

plained that a statute is not unconstitutional merely because it applies to certain territorial districts provided that it:

> applies to all districts and all persons who are similarly situated, and to all parts of the State where like conditions exist. Laws may be made to apply to a class only, and that class may be in point of fact a small one, provided the classification itself be a reasonable and not an arbitrary one, and the law be made to apply to all of the persons belonging to the class without distinction.

114 Va. at 718-719, 77 S.E. at 497. In *Settle*, we were able to articulate a rational relationship between the population density requirement and the purpose of the statute.

*Martin's Ex'rs* v. *Commonwealth*, 126 Va. 603, 102 S.E. 77 (1920), concerned compensation for the Clerk of the Circuit Court of the City of Norfolk. It was contended that the act under which his compensation was computed was special legislation. We held the compensation scheme constitutional. In that opinion, we set forth several principles important to the resolution of this appeal. We stated that "an arbitrary separation of persons, places or things of the same general class, so that some of them will and others of them will not be affected by the law, is of the essence of special legislation." 126 Va. at 610, 102 S.E. at 79. We also set forth the approach to be taken where the constitutionality of a statute is in doubt:

> In doubtful cases, a most useful guide in determining whether a statute is general or special within the meaning of constitutional limitations . . . is to be found in the underlying reasons for such limitations. They are intended, primarily, as a check upon the intentional exercise of legislative power conferring special privileges and immunities, or special restrictions and burdens, upon particular persons or localities to the exclusion of other persons or localities similarly situated. Plain legislative violations, whether expressly intended as such or not, must of course be condemned; but these limitations in the fundamental law had their genesis in a purpose to remedy the mischief of intentionally arbitrary and exclusive legislation.

*Id.* at 611-612, 102 S.E. at 80 (citing 1 J. Dillon, *Commentaries on the Law of Municipal Corporations*, § 141 (5th ed. 1911)). We also noted in *Martin's Ex'rs* that in order for classifications to be permissible,

[t]here must be some such difference in the situation of the subjects of the different classes as to reasonably justify some variety of rule in respect thereto. Though an act be general in form, if it be special in purpose and effect, it violates the spirit of the constitutional prohibition. An evasion of the pro-hibition "by dressing up special laws in the garb and guise [of] statutes" will not be permitted.

126 Va. at 612, 102 S.E. at 80 (citing 1 J. Dillon, *supra*, §§ 147 *et seq.*; 1 J. Sutherland, *Statutes and Statutory Construction* § 200 (J. Lewis 2d ed. 1904)). We emphasized the last point by stating: "The true principle would seem in all cases to be that the classification by population must not be *merely* a circuitous and disingenuous means of designating and legislating for particular localities." 126 Va. at 617, 102 S.E. at 81.

The principles discussed in *Settle* and *Martin's Ex'rs* form the framework in which cases of this type must be analyzed. These rules have been repeated over the years in almost every case of this kind. *See, e.g., Dean* v. *Paolicelli*, 194 Va. 219, 72 S.E.2d 506 (1952) (statute allowing federal employees living in counties of a certain size to hold elective office contrary to the general prohibi-tion against the same held unconstitutional); *Green* v. *County Board*, 193 Va. 284, 68 S.E.2d 516 (1952) (statute allowing coun-ties with an area of less than 70 square miles to use a special procedure for assessment declared arbitrary and unconstitutional); *County Bd. of Sup'rs* v. *Am. Trailer Co.*, 193 Va. 72, 68 S.E.2d 115 (1951) (statute permitting Fairfax County to levy certain taxes on trailers which other counties were not permitted to levy declared unconstitutional); *Shulman Company* v. *Sawyer*, 167 Va. 386, 189 S.E. 344 (1937) (statute providing that in Norfolk suits be instituted in a manner different. from that used in the rest of the Commonwealth declared unconstitutional); *Quesinberry* v. *Hull*, 159 Va. 270, 165 S.E. 382 (1932) (statute providing for appointment of a trial justice in Carroll County by a procedure different from that used statewide declared "utterly arbitrary" and thus unconstitutional); *Shelton* v. *Sydnor*, 126 Va. 625, 102

S.E. 83 (1920) (statute increasing compensation of certain county officials in fifteen named counties held unconstitutional).

Returning to a consideration of the specific statute here under review, we focus upon Chesapeake's argument. Chesapeake contends that the statute has two main divisions: All lands east of the Blue Ridge are entitled to the presumption while all lands west of the Blue Ridge are not. Neither party complains about these two main divisions. Chesapeake's only concern is about what the legislature has done with regard to lands west of the Blue Ridge. Chesapeake contends that the general provision that no presumption applies west of the Blue Ridge has been eroded by several exceptions. According to Chesapeake, these exceptions are arbitrary, bear no relation to the purpose of the statute, and are therefore unconstitutional.

An examination of the statute, along with 1980 census data which was relied upon by the parties, establishes the following: Augusta County, the site of this dispute, lies west of the Blue Ridge; therefore, it lies within the part of the Commonwealth where the presumption contained in Code § 55-154 does not generally apply. However, the presumption has been made applicable to Augusta County because the legislature has named Augusta County by name and has set forth a population range that includes Augusta.

When the population ranges in the statute are listed in order, we find the following population ranges where the presumption is operable, and by simple arithmetic we can determine the population ranges in which the presumption does not operate.

| Presumption Available | Presumption Not Available |
|---|---|
| 5,001 -  5,349 | 0 -  5,000 |
| 6,201 -  6,749 | 5,350 -  6,200 |
| 15,701 - 15,999 | 6,750 - 15,700 |
| 16,501 - 16,899 | 16,000 - 16,500 |
| 17,500 - 18,199 | 16,900 - 17,499 |
| 21,951 - 21,999 | 18,200 - 21,950 |
| 26,301 - 27,524 | 22,000 - 26,300 |
| 26,671 - 26,799* | 27,525 - 30,000 |
| 30,001 - 30,999 | 31,000 - 32,000 |
| 32,001 - 32,939 | 32,940 - 52,999 |
| 53,000 - 54,499 | 54,500 - 55,999 |
| 56,000 - 57,499 | 57,500 - 60,000 |

60,001 - 69,999                    70,000 - Upward

The range marked above with an asterisk is not a separate range at all; it is subsumed in the range 26,301 through 27,524.

As noted above, the portion of Code § 55-154 which concerns lands west of the Blue Ridge sets forth the names of several counties in which the presumption is to apply. Relying upon the 1984-85 Official State Highway and Transportation Map, it appears that there are thirty-three counties west of the Blue Ridge. Of these, only nine are listed by name as being entitled to the presumption. The northernmost county entitled to the presumption is Rockingham County and the southernmost is Bland County. The counties of Highland, Bath, Alleghany, and Rockbridge are surrounded by the nine counties listed in the statute by name as being entitled to the presumption yet none of the former is listed by name as being entitled to the presumption. Shenandoah and Page Counties are not named as being entitled to the presumption though they border Rockingham County which is named. Tazewell, Smyth, Wythe, Pulaski, Montgomery and Floyd Counties are not named though they border Bland, Giles, Craig, and Roanoke Counties which are named.

The other method of granting the benefit of the presumption to lands west of the Blue Ridge is by population category. When the counties are examined on that basis, Grayson, Carroll, Rockbridge, and Montgomery Counties are added to the list of counties west of the Blue Ridge to which the presumption applies. This increases the number of counties to which the presumption applies to thirteen, more than one-third of all the counties west of the Blue Ridge. Of these 13, Roanoke County has the largest population, 72,945; Craig County, with a population of 3,948, has the smallest.

The population range of 3,948 through 72,945 encompasses thirty-two of the thirty-three counties west of the Blue Ridge. Only Highland County, with a population of 2,937, falls outside the range. Moreover, when the populations for the counties entitled to the presumption are compared to those not entitled to the presumption, a haphazard pattern of inclusion and exclusion emerges. For example, Carroll County, with a population of 27,270, is included while Lee County, at 25,956, and Shenandoah County, at 27,559, are excluded; Rockbridge County, with a population of 17,911, is included while Alleghany County, which bor-

ders Rockbridge and which has a population of 14,333, and Page County, at 19,401, are not included.

Also, of the thirteen population ranges, six do not apply to any county. Further, there are several near misses with regard to inclusion: Bath County, with a population of 5,860, misses the range 5,001-5,349 by only 511; Warren County, with a population of 21,200, misses the range 21,951-21,999 by only 751; Russell County, with a population of 31,761, misses the range 30,001-30,999 by only 762 and misses the range 32,001-32,939 by only 240; and Lee County, with a population of 25,956, Scott County, with a population of 25,068, and Wythe County, with a population of 25,522, all barely miss the population range of 26,301-27,524,—while Shenandoah County, with a population of 27,559, misses the range 26,301-27,524 by only 35.

It is manifest to us that the pattern of inclusion and exclusion evident in the operation of Code § 55-154 as it applies to lands west of the Blue Ridge is without rhyme or reason. The provisions complained of do not apply to all counties similarly situated. We cannot conceive of a reasonable explanation pertinent to the purpose of the statute to explain the variations. There is no apparent rational relationship between gross population figures and the presence or accessibility of minerals, the value of mineral deposits, the density of habitation, or the condition of land titles in any given area. And no such rational relationship has been articulated by the Riddlebergers. As far as we can tell from the record, gross population figures have nothing whatever to do with whether the citizens of a particular county should be entitled to the presumption. Here, counties in similar situations are affected differently. The citizens in the counties west of the Blue Ridge where the presumption applies have a special privilege unavailable to their neighbors. In our view, the statute, as it operates west of the Blue Ridge, is merely a circuitous and disingenuous means of designating and providing local legislation. The so-called classifications are not classifications at all; they are designations of particular portions of the State west of the Blue Ridge. What the legislature has done in this case is precisely what the Constitution of the Commonwealth forbids.

■ The Riddlebergers argue that this case is controlled by *Love v. National Bank*, 205 Va. 860, 140 S.E.2d 650 (1965), where we declared constitutional the predecessor of the code section here under review. However, *Love* is distinguishable. It concerned

property in Campbell County, which lies east of the Blue Ridge. In such eastern counties, then as now, the presumption applied across the board. The facts in *Love* did not require the Court to consider the effect of exceptions to the general rule that the presumption does not apply to lands west of the Blue Ridge.[1] *Love* did not concern a population-based classification because, as noted, Campbell County lies east of the Blue Ridge and the benefit of the presumption in that part of the Commonwealth was not tied to population.[2]

█ In light of the foregoing, we hold unconstitutional those provisions in Code § 55-154 which create exceptions to the general provision that the presumption concerning extinguishing mineral rights does not apply west of the Blue Ridge.[3] Therefore, the decision of the trial court will be

*Affirmed.*

COCHRAN, J., dissenting.

In my view, the majority opinion, declaring unconstitutional certain provisions of Code § 55-154, represents an unjustified abandonment of the doctrine of *stare decisis* to which we have often expressed our devotion. The effect may be to replace order with confusion, certainty with doubt, assurance with insecurity. A brief review of the history of the statute reveals a sound underlying legislative intent.

---

[1] The distinction between eastern and western counties is a familiar one, being based upon historic, topographic, and demographic factors too familiar to require discussion.

[2] In *Love* we quoted the following statement: "The number of inhabitants of a county is a basis for a valid classification." *Id.* at 865, 140 S.E.2d at 653. The source of that quotation was foreign authority quoted in *Settle*, 114 Va. at 720, 77 S.E. at 497, but it was dictum in *Settle* as well as in *Love* because *Settle* concerned population density not gross population.

Gross population figures may, of course, be a valid basis of classification. Indeed, in *Martin's Ex'rs*, we upheld just such a classification as a rational basis for fixing compensation of public officials. But there, it was apparent that the workload of such officials might rationally depend upon the size of the population they served. Here by contrast, we can conceive of no such rational relationship.

[3] The dissent contends, rendering a minority advisory opinion without any citation of authority, that invalidation of this statute will "upset the stability of land titles throughout the designated regions." The minority's fears are unfounded and we reject the argument. *See* Annot., 167 A.L.R.2d 517 (1947).

The first law establishing a prima facie presumption of nonexistence of "minerals, coals, oils, or ores" was enacted in 1924. Acts 1924, c. 472. The Act applied only to "non-mountainous" land having an elevation not in excess of 600 feet; as to such land, the presumption operated after 50 years had elapsed. In other respects, the substantive provisions and procedural safeguards of the original Act were repeated in subsequent amendments.

In 1930, the Act was amended to provide that the presumption should apply to all land except that located west of the Blue Ridge Mountains. Acts 1930, c. 472. In 1944, the Act, codified as Code § 6239a, was amended to reduce to 35 years the 50-year period required to activate the presumption. Acts 1944, c. 49. In 1956, the General Assembly for the first time exempted certain counties by population from the general exception applying to land lying west of the Blue Ridge. Acts 1956, c. 642. Additional population categories were added by later amendments. Acts 1964, c. 377; Acts 1968, c. 319; Acts 1970, c. 350; Acts 1981, c. 518. In recent years, the General Assembly has exempted by name certain counties from the geographical exception to the statutory presumption. Acts 1972, c. 306; Acts 1973, c. 123; Acts 1974, c. 238; Acts 1977, c. 309; Acts 1980, c. 310; Acts 1981, c. 518; Acts 1984, c. 452.

In *Love* v. *National Bank*, 205 Va. 860, 140 S.E.2d 650 (1965), we upheld the constitutionality of Code § 55-154 as it existed in 1963, after several counties had been excluded from the general exception by population but before any were excluded by name. We observed that the Act was a statute of repose providing a "rule of evidence for setting at rest titles to land when its value is reduced because of a reservation of non-existent values therein." 205 Va. at 864, 140 S.E.2d at 653. Noting that no evidence or authority to the contrary had been presented, we held that the statute was "general and impartial in its operation on all persons and lands similarly situated" and was not violative of the constitutional prohibition against special, local, or private legislation. 205 Va. at 865, 140 S.E.2d at 653.

It is apparent that the legislative intent in enacting the law was to settle land titles throughout the state where mineral rights, once reserved, were no longer exercised; excepted from the statutory presumption, however, was the area where marketable minerals were most prevalent. It is likewise apparent that the legislative

intent has remained constant through the numerous statutory amendments.

The majority relies on the location east of the Blue Ridge of the mineral rights in *Love* as distinguishing that case from the present case. Nevertheless, in *Love*, we held the statute constitutional when it contained exceptions based on population classifications. Therefore, the following well-established principle is relevant:

> Even if it be said that the same constitutional questions raised here have not been previously passed upon, we have repeatedly held that a decree or judgment of this Court upholding the constitutionality of a statute conclusively settles the question of its validity and the statute is then free from all constitutional objections, whether assigned or not.

*Myers* v. *Moore*, 204 Va. 409, 412, 131 S.E.2d 414, 417 (1963).

Thus, it is immaterial that the earlier attack on the statute may have relied on different grounds. *Id.*, 131 S.E.2d at 417; *City of Portsmouth* v. *Weiss*, 145 Va. 94, 103, 133 S.E. 781, 784 (1926). The doctrine of *stare decisis* requires that we adhere to our prior determinations in order to promote an orderly society in which men may rely on judicial precedents. *Myers*, 204 Va. at 413, 131 S.E.2d at 417. As we noted in *Myers*, application of *stare decisis* is especially compelling where property rights are at stake. *Id.*, 131 S.E.2d at 417. In the 20 years since *Love* was decided, property owners have reasonably relied on the presumption granted to those excluded from the geographical exception. To invalidate this statute, which in substantially similar form we validated in *Love*, would work an injustice on such property owners and upset the stability of land titles throughout the designated regions. Moreover, the General Assembly was entitled to rely on *Love* as validation of the statutory scheme employed in drafting the amendments. There has been no change in the legislative intent and that intent has been manifested in valid classifications. Under the doctrine of *stare decisis*, therefore, the challenge to § 55-154 should be rejected.

The majority's position is infirm for two additional reasons. First, the majority invalidates the statute insofar as it creates exceptions to the general provision that there is no presumption west

of the Blue Ridge. But this holding misconstrues the statute. The general provision is that a presumption exists throughout most of the state. The exception applies to lands west of the Blue Ridge. By exempting certain counties from the exception, the designated counties merely fall within the general provision establishing the presumption. The landowners in this case, entitled to the presumption because their property is in Augusta County, are treated under § 55-154 identically with landowners in the overwhelming majority of counties in the state. As to these property owners, therefore, the statute is not "special" or "local". A law is special because of what it excludes, not because of what it includes. *Martin's Ex'rs* v. *Commonwealth*, 126 Va. 603, 612, 102 S.E.2d 77, 80 (1920). As to these landowners, entitled to the presumption afforded by § 55-154, the statute can only be deemed general.

Second, laws which apply only to certain geographical areas or population categories are not *per se* invalid. Where the classification is reasonable and not arbitrary, laws may apply to the members of one class and not another. *Martin's Ex'rs*, 126 Va. at 612, 102 S.E. at 80; *Ex Parte Settle*, 114 Va. 715, 718-19, 77 S.E. 496, 497 (1913). If any state of facts reasonably can be conceived to sustain a challenged statute, that state of facts must be assumed to have existed when the statute was adopted. *Love*, 205 Va. at 865, 140 S.E.2d at 653; *Martin's Ex'rs*, 126 Va. at 612-13, 102 S.E. at 80.

The legislative intent to lessen the burden on property owners throughout the state seeking to extinguish valueless mineral rights furnishes a reasonable justification for the statute. But the General Assembly prudently sought to protect dormant mineral rights in areas known to be rich in coal, minerals, oil, and other subsurface deposits. As specific counties initially excepted from the statutory presumption demonstrated the appropriateness and advisability of such a presumption within their territorial limits, the legislature properly brought those lands within the ambit of the general provision, thereby steadily contracting the area within which the presumption is inapplicable. Since a classification's reasonableness is primarily a matter for the legislature, *Love*, 205 Va. at 865, 140 S.E.2d at 653, we should not disturb the legislature's classification of the counties designated in § 55-154. Here, as in *Love*, there is no evidence that the classification is arbitrary.

I would reverse the judgment of the trial court sustaining the demurrer and remand the case for further proceedings pursuant to

the provisions of the statute. Accordingly, I dissent from the majority opinion.

CARRICO, C.J., and STEPHENSON, J., join in this dissent.